IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A. L. et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 17-357 |
| v. ) | |
| ) | Hon. Nora Barry Fischer |
| ADELAIDE L. EICHMAN et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

**I. Introduction**

Presently before the Court is Defendants Allegheny County, Andrew Fleming, and Anjelica Salih's[1] Motion to Dismiss for Failure to State a Claim and supporting brief, (Docket Nos. [23], [24]); Plaintiffs' Response in Opposition, (Docket No. [28]); and Allegheny County, Fleming, and Salih's reply, (Docket No. [34]); as well as Defendant Adelaide L. Eichman's Motion to Dismiss for Failure to State a Claim and supporting brief, (Docket Nos. [26], [27]); Plaintiffs' Response in Opposition, (Docket No. [30]); and Eichman's reply, (Docket No. [31]). After careful consideration of the parties' submissions, in light of the standards governing motions to dismiss set forth by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and as articulated in Third Circuit precedent, *see, e.g.*, *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016), and for the following reasons, Defendants' respective motions, (Docket Nos. [23], [26]), are DENIED,

---

[1] On May 5, 2017, the Court granted the parties' stipulation to amend the caption of this matter to include Anjelica Salih in place of Angelica Doe. (Docket No. 22).

1

without prejudice to Defendants renewing their arguments at the motion for summary judgment stage of this matter.

## II. Background

This matter arises from allegations of child abuse made against Plaintiffs. The following pertinent facts are alleged in the Complaint, which the Court will accept as true for the sole purpose of deciding the pending motion.

Plaintiffs are the natural parents to two children, S.L.W. and D.W. (Docket No. 1 at ¶¶ 4-5). Plaintiffs' child, S.L.W., was born in 2015. (*Id*. at ¶ 13). During his one-month well visit on July 14, 2015, four bruises were noticed on S.L.W., one on his forehead, left inner elbow, left lower back, and right bottom back of the leg. (*Id*. at ¶¶ 17-18). The pediatricians' office became concerned that S.L.W. might have a coagulation disorder and insisted that S.L.W. be taken to Children's Hospital of Pittsburgh ("CHP"). (*Id*. at ¶ 19).

CHP's medical records indicate that on July 14, 2015, at 11:20 a.m., a "4 week old previously healthy male presenting with multiple bruises over body noticed by PCP at wellness baby check. Parents not able to give appropriate explanation for all bruises. Possible trauma to head from swing as per mother and bruise to back from father doing massaging the tummy with his plam [sic] around his back." (*Id*. at ¶ 20). At the CHP emergency room, S.L.W.'s blood pressure was taken. (*Id*. at ¶ 21). As the cuff was being removed from S.L.W.'s leg, a bruise was noticed where the cuff had been, and this new bruise was documented and marked as "MD aware." (*Id*. at ¶¶ 22-23). S.L.W. was found not to have any abnormalities in his eyes, no retinal hemorrhages, and no fractures of any bones. (*Id*. at ¶¶ 30-32).

At approximately 11:45 a.m., Eichman, who is a physician licensed to practice medicine in Pennsylvania and who holds herself out as an expert in distinguishing medical conditions that can mimic the appearance of child abuse from cases of actual child abuse, interviewed A.L. (*Id*. at ¶¶ 6, 24). During the interview, Eichman indicated that she would order the most common blood disorder testing but that, more often than not, abuse by an adult caretaker causes such bruising, not a coagulation problem. (*Id*. at ¶ 25). Eichman was informed that S.L.W.'s mother, Plaintiff A.L., had a history of easy bruising and heavy menstrual blood flows but that she had not had a formal workup done. (*Id*. at ¶¶ 26-27). Eichman directed A.L. to bring in her older child, D.W., for an examination for possible abuse because of her diagnosis that S.L.W. had been abused. (*Id*. at ¶¶ 4-5, 28).

D.W. was found to have no abnormalities during her exam. (*Id*. at ¶ 33). At approximately 7:00 p.m. on July 14, 2015, Defendant Salih arrived at CHP and conducted interviews with A.L. and S.W. (*Id*. at ¶ 34). During the interview, Salih stated that a safety plan must be imposed that prohibited all unsupervised contact between S.W. and both children and that A.L. must submit to home visits by Defendant Allegheny County in the Allegheny County Children, Youth, and Families Services Agency ("CYF") and their contracted agencies. (*Id*. at ¶¶ 8, 34). A.L. signed the safety plan but neither A.L. nor S.W. were given a copy of it or told that they had any right to appeal the safety plan. (*Id*. at ¶¶ 34-36). Because the unilaterally imposed safety plan prohibited contact between both children and S.W., Plaintiffs both left the hospital, leaving S.L.W. alone at the hospital overnight. (*Id*. at ¶ 38). At 10:00 p.m., Salih conducted a home inspection of A.L.'s and S.W.'s home as part of the safety plan. (*Id*. at ¶ 39). Salih again did not explain that Plaintiffs had any right to appeal the safety plan and did not

3

provide Plaintiffs with a copy of the safety plan or any notice of rights to appeal the safety plan. (*Id*. at ¶¶ 40-42).

In the morning on July 15, 2015, Plaintiffs returned to CHP and spoke with Eichman. (*Id*. at ¶¶ 43-44). During Plaintiffs' meeting with Eichman, A.L. asked why S.L.W. was bruised by the blood pressure cuff and pointed out how small the bruises on S.L.W. were and that blood work was still pending. (*Id*. at ¶ 45). In response, Eichman stated, "I wouldn't hang your hat on [the pending blood work]." (*Id*. at ¶ 46). A.L. asked Eichman whether there was anything parents could do in the daily routine of caring for S.L.W. that would exert the same pressure on S.L.W. as a blood pressure cuff. (*Id*. at ¶ 47). When pressed for an answer by A.L., Eichman said that "it's not routine to get a blood pressure on an infant" and then excused herself from the room, directing further questions to the nurse practitioner or the social worker. (*Id*. at ¶¶ 48-49).

At approximately 12:00 p.m., Defendant Fleming interviewed A.L. and S.W. and reiterated the terms of the safety plan to them. (*Id*. at ¶¶ 50-51). He did not give A.L. or S.W. a copy of any safety plan, did not explain that they have a right to appeal the safety plan, and did not give them a copy of any notice of rights to appeal the safety plan. (*Id*. at ¶¶ 52-54). At approximately 2:30 p.m., CHP employees informed Plaintiffs that S.L.W.'s blood samples drawn the previous day had been lost and that another blood sample would need to be drawn. (*Id*. at ¶ 55). S.L.W. was discharged from CHP after CHP employees drew an additional blood sample from him for coagulation studies. (*Id*. at ¶¶ 56-57).

On July 17, 2015, Eichman called A.L. to inform her that the results of the coagulation study were normal and that there was no indication for repeat bleeding disorder testing. (*Id*. at ¶¶ 58-59). Eichman's note in the medical records dated July 17, 2015 stated:

4

> I gave [S.L.W.'s] mother the preliminary result of his von Willebrand screen. I explained that these results will be verified by the hematologist and that I will call if there are any changes in the results, I will call his family. His mother asked whether there was any significance to his factor IX level being at the lower range of normal range. I explained that I spoke with the attending hematologist, and that normal is normal. If [S.L.W.] had a clinically significant bleeding disorder, the screens sent (Factor VII, Factor IX and von Willebrand screen) would have showed an abnormality.

(*Id*. at ¶ 60). There is no evidence in the medical records obtained by Plaintiffs to indicate a hematology consult at CHP for S.L.W. (*Id*. at ¶ 61). Eichman failed to note in the medical record, or to inform Plaintiffs, CYF, or law enforcement, that she knew that a young child's screening tests could be normal even when the child actually has a bleeding problem that could cause bruising from normal child handling. (*Id*. at ¶ 62).

Fleming began weekly visits to Plaintiffs' home on July 20, 2015. (*Id*. at ¶ 63). After a police detective notified Plaintiffs that a criminal investigation was underway, they retained an attorney. (*Id*. at ¶¶ 64-65). On July 28, 2015, Plaintiffs took S.L.W. to a follow-up appointment with Eichman at CHP's Child Advocacy Clinic, at which time Eichman noted in her report that S.L.W.'s bruises were from physical child abuse. (*Id*. at ¶ 67-68). Eichman failed to note in her report, or to inform CYF or law enforcement, that she was aware that a young child's screening test could be normal even when the child actually has a bleeding problem that could cause bruising from normal child handling. (*Id*. at ¶ 69). Upon Plaintiffs' information and belief, Eichman's report was shared with CYF and law enforcement for use in the criminal investigation. (*Id*. at ¶ 70).

On August 12, 2015, A.L. took S.L.W. to the Hemophilia Center of Western Pennsylvania ("HCWP") for an evaluation. (*Id*. at ¶ 78). The August 12, 2015 report from the HCWP stated that "[p]latelet function disorders and Von Willebrand testing is often unreliable in

infants younger than 6 months of age." (*Id*. at ¶ 84). The report also stated that most specialists recommend waiting until a later stage in infancy for a more interpretable test. (*Id*.).

From August 13, 2015 through December 30, 2015, Plaintiffs endured weekly intrusions into their home by a CYF employee pursuant to the unilaterally imposed safety plan. (*Id*. at ¶¶ 94-95; *see also id.* at ¶¶ 63, 66, 76-77, 119). On August 12, 2015, CYF filed and served dependency petitions, alleging that S.L.W. and D.W. did not have any parent capable of caring for them as a result of Eichman's representation that the bruises on S.L.W. were the result of physical child abuse. (*Id*. at ¶ 93). On August 19, 2015, a criminal complaint with one count of aggravated assault (F2) and one count of endangering the welfare of a child (M1) was filed against S.W. based upon an affidavit of probable cause by a Detective Honan. (*Id*. at ¶ 96). Detective Honan's affidavit of probable cause recited the language of Eichman's Child Advocacy Center report. (*Id*. at ¶ 97). S.W. voluntarily turned himself in on August 20, 2015 and spent one night in jail before being released on bond, with the condition that he have no contact with any children, including his own. (*Id*. at ¶¶ 98-99).

On August 21, 2015, A.L. was diagnosed by the HCWP with abnormal platelet function. (*Id*. at ¶ 100). On August 21, 2015, A.L. moved out of the family residence with both S.L.W. and D.W. and moved in with A.L.'s mother to comply with the condition of S.W.'s bail that he have no contact with any children. (*Id*. at ¶ 101). From late August until mid-October 2015, Plaintiffs missed time from work to meet with Child Advocacy groups, to undergo court ordered psychological evaluations, to attend hearings, and to attend court mandated parenting classes. (*Id*. at ¶¶ 102-108). From October through early December 2015, Plaintiffs were required to allow a case worker from a CYF contracted agency to enter their home. (*Id*. at ¶¶ 109-111).

6

On October 20, 2015, S.L.W. had blood drawn for a bleeding disorder workup after he reached six months of age. (*Id*. at ¶ 112). On October 27, 2015, the results from the bleeding workup showed that S.L.W. has a platelet function disorder. (*Id*. at ¶ 113). On November 11, 2015, S.L.W. was diagnosed by the HCWP with abnormal platelet function. (*Id*. at ¶¶ 85, 114). On November 18, 2015, Eichman issued an addendum to her July 29, 2015 Child Advocacy Center report, noting that she had received a call from S.L.W.'s hematologist and was informed that he had been diagnosed with a platelet function disorder which would make it easier for S.L.W. to bruise. (*Id*. at ¶¶ 86, 115). Eichman later admitted her error under oath. (*Id*. at ¶ 87). She also testified that she knew there was a risk that a young infant could have normal screening tests yet still have a bleeding disorder. (*Id*. at ¶ 88). Eichman never informed Plaintiffs, CYF, or law enforcement that she had failed to conduct the testing necessary to rule out a bleeding disorder as the cause of S.L.W.'s bruising or that the test she had ordered could be normal even when a child actually has a bleeding problem that could cause bruising from normal child handling. (*Id*. at ¶¶ 89-90). Eichman also failed to inform Plaintiffs, CYF, and law enforcement that children under six months of age may not be able to be diagnosed with a bleeding disorder that could explain the bruising here even if the child actually has a bleeding disorder. (*Id*. at ¶¶ 91-92). Eichman's addendum caused CYF to withdraw its dependency petition and for the criminal charges against S.W. to be withdrawn. (*Id*. at ¶¶ 116-117). On May 4, 2016, A.L. was notified that the ChildLine report against her was changed to "unfounded." (*Id*. at ¶ 120).

Plaintiff filed this action on March 22, 2017, alleging procedural, substantive, and Fourth Amendment due process claims against Defendants. Allegheny County, Fleming, and Salih filed a Motion to Dismiss for Failure to State a Claim and supporting brief on May 25, 2017. (Docket Nos. 23, 24). Plaintiffs filed a Brief in Opposition to Defendants' Motion on June 5, 2017, to

7

which Defendants replied on June 27, 2017. (Docket Nos. 28, 34). On May 25, 2017, Eichman filed a Motion to Dismiss for Failure to State a Claim and supporting brief. (Docket Nos. 26, 27). Plaintiffs filed a Brief in Opposition to Defendants' Motion on June 6, 2017, to which Eichman replied on June 14, 2017. (Docket Nos. 30, 31). The parties did not request additional briefing or oral argument. Thus, these matters are now ripe for disposition.

### III. Legal Standard

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a Rule 12(b)(6) challenge, the plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Thus, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Although the Court must accept the allegations in the complaint as true, "'[it is] not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the plaintiff must plead facts which permit the

court to make a reasonable inference that the defendant is liable. *Twombly*, 550 U.S. at 556-57; *Iqbal*, 556 U.S. at 678.

Consistent with these principles, the Third Circuit Court of Appeals has prescribed a three-step analysis for purposes of determining whether a claim is plausible. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Third, the court should assume the veracity of all well-pled factual allegations and then "'determine whether they plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). This third step of the analysis is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

IV. **Discussion**

A. Allegheny County, Fleming, and Salih's Motion to Dismiss

In their Motion to Dismiss, Allegheny County, Fleming, and Salih assert that they are entitled to absolute and qualified immunity. (Docket No. 24 at 7-10). Aside from citing to authority holding that CYF employees "'are entitled to absolute immunity for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings,'" (Docket No. 24 at 9 (quoting *Ernst v. Child & Youth Servs.*, 108 F.3d 486 (3d Cir. 1997)), Defendants fail to provide any support for their arguments. (Docket No. 24 at 9 (quoting *Ernst v. Child & Youth Servs.*, 108 F.3d 486 (3d Cir. 1997); *see also generally* Docket Nos. 24, 34).

9

Well-settled precedent provides that the procedural component of parental due process rights is triggered "anytime the state seeks to alter, terminate, or suspend a parent's right to the custody of his minor children." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003). As Plaintiffs point out in their response to Defendants' motion, (*see* Docket No. 28 at 6-7), the Commonwealth of Pennsylvania's Department of Public Welfare's memorandum regarding safety planning and due process protections refers to *McCurdy* and provides:

> Due process is required any time a separation occurs within the family and in other situations in which a deprivation of rights occurs, including, but not limited to:
> - Any altering of parental capacity;
> - Separation of a parent from a child;
>   - Removal of a parent;
>   - Removal of a child;
> - Interference with custody;
> - Interference with decision making authority;
> - Interference with parental visitation, such as limiting unsupervised contact with a child.

(Docket No. 28-1 at 6). Here, the safety plan imposed prohibited all unsupervised contact between S.W. and both children, and A.L. was required to submit to home visits. (Docket No. 1 at ¶¶ 8, 34). Despite the safety plan's provisions, Plaintiffs were not given a copy of it, were not told that they had any right to appeal it, and were not given a copy of any notice of the right to appeal it. (*Id.* at ¶¶ 8, 35-37, 40-42, 52-54).

Under similar circumstances, courts within the Third Circuit have denied motions to dismiss. For example, in *Isbell v. Bellino*, 983 F. Supp. 2d 492 (M.D. Pa. 2012), the District Court explained that "the imposition of a voluntary safety plan may, under some circumstances, deprive a parent of their constitutional right to familial association." *Id.* at 501. Because the plaintiffs "pled sufficient facts which, if true, establish that they were deprived of their right to care, custody and management of their children without due process of law," the District Court

denied the defendants' motion to dismiss. *Id.* at 502. Similarly, in *Billups v. Penn State Milton S. Hershey Medical Center*, No. 11-CV-1784, 2012 U.S. Dist. LEXIS 56414 (M.D. Pa. Apr. 23, 2012), the District Court concluded that the plaintiffs' allegations "could give rise to the conclusion that [the county defendants] deliberately denied [the plaintiffs] due process and deliberately coerced them into signing [a safety] plan without proper legal grounds." *Id.* at *65. Thus, the District Court determined that it was premature to make a qualified immunity determination. *Id.*; *see also Starkey v. York Cnty.*, No. 11-981, 2011 U.S. Dist. LEXIS 157646, at *11-24 (M.D. Pa. Sept. 21, 2011) (denying motion to dismiss as to due process claims because the plaintiffs had pled sufficient facts supporting that they were deprived of their right to care, custody, and management of their children without due process of law). Indeed, the Court has been unable to locate any decisions supporting Defendants' position and, as noted, Defendants have failed to provide same. Thus, given the circumstances of this case, and taking Plaintiffs' well-pled allegations as true, the Court will deny Defendants' Motion to Dismiss.

     B. Eichman's Motion to Dismiss

In her Motion to Dismiss, Eichman argues that she is not a state actor and that her conduct did not rise to the level of deliberate indifference. (Docket No. 27 at 6-12). Specifically, she asserts that her "tenuous connections" with the state through her employment with the University of Pittsburgh School of Medicine and CHP, and the alleged contractual agreement between those entities and Allegheny County to provide medical investigative services are insufficient to establish that she is a state actor. (*Id.* at 7).

"'To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Tatsch-Corbin v. Feathers*, 561 F.

11

Supp. 2d 538, 543 (W.D. Pa. 2008) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). The Third Circuit has established three tests that can be used to determine whether state action exists: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state;" (2) "whether the private party has acted with the help of or in concert with state officials;" and (3) "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal brackets and quotations omitted). "Under any test, the inquiry is fact-specific." *Id.* (internal brackets and quotations omitted).

The Court finds that Plaintiffs have alleged facts sufficient to establish a reasonable likelihood that Eichman will qualify as a state actor as articulated in *Kach*. In their Complaint, Plaintiffs allege that Eichman "is the primary medical investigator on behalf of Allegheny County and law enforcement." (Docket No. 1 at ¶ 6). Plaintiffs contend that Allegheny County and CHP have a contract in which CHP provides services to Allegheny County's CYF, which includes the investigations of child abuse and neglect. (*Id.* at ¶ 74). As the service provider, CHP is to provide written reports and/or court testimony in Allegheny County Juvenile Court and Allegheny County Criminal Court. (*Id.*). Plaintiffs also assert that between July 1, 2015 and June 30, 2016, CHP received $1,759,750.00 from Allegheny County for services that included those provided by Eichman in her role as a medical investigator. (*Id.* at ¶ 75). Accepting these allegations as true, coupled with Plaintiffs' allegations with respect to Eichman's examinations of S.L.W., the Court concludes that Eichman's examinations of S.L.W. were for the purpose of determining whether the bruising on his body was the result of S.W.'s alleged criminal activity. At this stage of the litigation, Plaintiffs' allegations are sufficient to support a finding of state

action. *See, e.g., Billups v. Penn State Milton S. Hershey Med. Ctr.*, 910 F. Supp. 2d 745, 757-58 (M.D. Pa. 2012) (finding that the plaintiffs had alleged sufficient facts to establish that the defendant doctors would qualify as state actors because they examined the child to determine whether her injuries were the result of criminal activity); *see also Seldomridge v. Penn State Hershey Med. Ctr.*, No. 13-CV-2897, 2014 U.S. Dist. LEXIS 80743, at *10 (M.D. Pa. June 12, 2014) (concluding that the defendants qualified as state actors because they "conducted testing, and rendered opinions for the primary purpose of investigating suspected child abuse—not providing medical treatment").[2]

With respect to deliberate indifference, Eichman contends that her Motion to Dismiss must be granted because Plaintiffs' allegations do not indicate that she acted with deliberate indifference. (Docket No. 27 at 9-12). In support thereof, Eichman emphasizes that she performed the standard testing for blood disorders on S.L.W., which was negative. (*Id.* at 11). Eichman asserts that she, therefore, had reasonable and articulable evidence of abuse and that she did not consciously disregard a great risk that no abuse had occurred. (*Id.*).

As previously discussed, "[t]he Supreme Court has recognized a 'fundamental liberty interest of natural parents in the care, custody, and management of their child.'" *Miller v. City of Phila.*, 174 F.3d 368, 373 (3d Cir. 1999) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)); *see also Anspach v. City of Phila.*, 503 F.3d 256, 261 (3d Cir. 2007). "This interest,

---

[2] In *Seldomridge*, the District Court rejected the defendants' reliance upon *Dennis v. DeJong*, 867 F. Supp. 2d 588, (E.D. Pa. 2011), because *Billups* was a more recent decision and was factually similar. Here, Eichman solely relies upon *Dennis* to support her argument that she is not a state actor. (*See* Docket No. 27 at 7-9; Docket No. 31 at 3 n.1). The Court finds that Eichman's reliance upon *Dennis* is misplaced for the same reasons articulated in *Seldomridge*, as both *Billups* and *Seldomridge* are more recent decisions and are factually similar to the instant matter. Further, at this stage of the litigation, the Court rejects Eichman's argument that "[P]laintiffs have failed to establish that [her] 'sole role' was to investigate potential child abuse," (Docket No. 31 at 4), because Eichman provides no support for her argument and because Plaintiffs have sufficiently pled facts demonstrating that Eichman's "primary" purpose in examining S.L.W. was to investigate suspected child abuse. *Seldomridge*, 2014 U.S. Dist. LEXIS 80743, at *10.

however, must be balanced against the state's interest in protecting children suspected of being abused." *Miller*, 174 F.3d at 373. "[T]he standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" *Id.* at 375-376. "That standard is satisfied if the child is removed without 'an objectively reasonable suspicion of abuse,' based on the information available at the time." *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 241 (3d Cir. 2013) (quoting *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997)). "'Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power.'" *Id.* (quoting *Croft*, 103 F.3d at 1126).

In their Complaint, as set forth in more detail above, Plaintiffs allege that while at the CHP emergency room, a bruise was noticed where a blood pressure cuff had been placed on S.L.W.'s leg, and a note was made in his medical record. (Docket No. 1 at ¶¶ 21-23). A.L. informed Eichman that she had a history of easy bruising and heavy menstrual blood flows, and she asked Eichman why S.L.W. was bruised by the blood pressure cuff. (*Id.* at ¶¶ 26-27, 44-49). Plaintiffs also allege that after the results of S.L.W.'s coagulation studies were normal, Eichman's medical note indicated that the results would be verified by a hematologist. (*Id.* at ¶¶ 58-60). Plaintiffs contend that a hematologist was not consulted. (*Id.* at ¶ 61). They further assert that although Eichman knew that a child's tests could be normal even when the child actually has a bleeding problem, she did not include this information in her report or disclose it to CYF or law enforcement. (*Id.* at ¶¶ 62, 69). Plaintiffs aver that instead, Eichman prepared a Child Advocacy Center report, which was shared with CYF and law enforcement, wherein she stated that the bruises found on S.L.W. were the result of physical child abuse. (*Id.* at ¶¶ 68-70). They also maintain that Eichman admitted her error under oath and testified that she knew there

14

was a risk that a young infant could have normal screening tests yet still have a bleeding disorder. (*Id.* at ¶¶ 87-88). Plaintiffs allege that Eichman never informed Plaintiffs, CYF, or law enforcement that she had failed to conduct the testing necessary to rule out a bleeding disorder as the cause of S.L.W.'s bruising. (*Id.* at ¶¶ 89-90).

Taking Plaintiffs' allegations as true, the Court finds that Plaintiffs have sufficiently pled a substantive due process claim to survive a motion to dismiss. The Court again concludes that this matter is factually similar to *Billups*, wherein the District Court denied the defendants' motion to dismiss the plaintiffs' substantive due process claim because the plaintiffs had alleged that the defendants "represented that they had considered and rejected other bases for [the child's] injuries, when they had not conducted the necessary testing to reach such conclusions." 910 F. Supp. 2d at 760. Accordingly, at this juncture, the Court will deny Eichman's Motion to Dismiss.

Alternatively, Eichman argues that her Motion to Dismiss must be granted because Plaintiffs failed to file a Certificate of Merit. (Docket No. 27 at 12-15). Eichman is correct that Pennsylvania law requires that a Certificate of Merit accompany a claim for professional liability brought against certain designated licensed professionals. Pursuant to this rule, a Certificate of Merit must be filed within sixty days following any action where it is alleged that "a licensed professional deviated from the acceptable professional standard." Pa.R.C.P. 1042.3. The Third Circuit has held that this Certificate of Merit requirement is a rule of substantive law and must be applied by federal courts in professional negligence cases. *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 264-65 (3d Cir. 2011).

In response to Eichman's argument, Plaintiffs contend that a Certificate of Merit is not required because they are not asserting any professional negligence claims against Eichman.

15

Having reviewed Plaintiffs' Complaint, and accepting Plaintiffs' representation, the Court agrees that Plaintiffs' claims against Eichman do not sound in professional negligence. To the extent, however, that Plaintiffs later attempt to assert professional liability claims against Eichment, they will be subject to dismissal with prejudice because Plaintiffs have not filed a Certificate of Merit.[3]

## V. Conclusion

For the foregoing reasons, the Court DENIES Defendants Allegheny County, Andrew Fleming, and Anjelica Salih's Motion to Dismiss for Failure to State a Claim, (Docket No. [23]), and DENIES Defendant Adelaide L. Eichman's Motion to Dismiss for Failure to State a Claim and supporting brief, (Docket Nos. [26]).

An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record

---

[3] Eichman also requested that Plaintiffs be ordered to file a more definite statement because their Complaint was too vague and ambiguous. (Docket No. 27 at 15-17). After reviewing Plaintiffs' response in opposition to her Motion to Dismiss, Eichman withdrew her request. (Docket No. 31 at 8). As such, the Court will not address Eichman's request for a more definite statement, concurring that it is now moot.