**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.L. and S.W., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 17-357 |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| Adelaide L. Eichman, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.     Introduction

Pending before the Court are the parties' cross-motions for summary judgment on the issue of whether Defendant Adelaide L. Eichman, M.D., is a state actor under 42 U.S.C. § 1983.  (Docket Nos. 57 and 59).  For the reasons that follow, the Court finds that Dr. Eichman is not a state actor; therefore, Defendant's summary judgment motion will be granted and Plaintiffs' motion will be denied.

### II.     Background

This matter arises from allegations of child abuse made against Plaintiffs A.L. and S.W. Plaintiffs filed this action on March 22, 2017, against Dr. Eichman and three other Defendants, Allegheny County, Andrew Fleming and Anjelica Salih, under 42 U.S.C. § 1983 alleging procedural, substantive, and Fourth/Fourteenth Amendment due process claims against Defendants.  (Docket No. 1).  Defendants filed motions to dismiss for failure to state a claim, which the Court denied on July 14, 2017.  (Docket Nos. 23, 26, 35, 36).  On March 28, 2018, pursuant to a stipulation of dismissal by the parties, the Court ordered that all claims against

1

Defendants Fleming, Salih and Allegheny County were dismissed with prejudice. (Docket Nos. 53, 54).

Following discussion at a post-fact discovery status conference, the parties agreed to proceed to summary judgment on the issue of whether Dr. Eichman is a state actor. Accordingly, the parties filed their cross motions for summary judgment and supporting briefs on June 15, 2018, followed by responses in opposition, replies and sur-replies to same. (Docket Nos. 57-61, 63-66, 68, 70-73). On September 7, 2018, the Court held oral argument on the parties' cross-motions for summary judgment. (Docket No. 74). Each party subsequently submitted supplemental records and argument in support of their respective position, and the transcript of the oral argument was filed on October 1, 2018. (Docket Nos. 76, 77, 80). Accordingly, the matter is now ripe for disposition.

### III.     Relevant Facts[1]

The Allegheny County Department of Human Services, Office of Children Youth and Families ("CYF") entered into a contract with Children's Hospital of Pittsburgh of the UPMC Health System ("CHP") for the period July 1, 2015 to June 30, 2016, pursuant to which CHP agreed to provide health services for children including comprehensive physical exams, intake or discharge exams, x-rays, treatment for injury and psychosocial assessments. (Docket No. 60-4 at 1, 49). The contract stated that CHP "shall also participate in investigations of child abuse and neglect [and] shall provide written reports and/or court testimony in Allegheny County Juvenile Court and Allegheny County Criminal Court." (Id. at 49).

According to the Annual Statement of the Child Advocacy Center ("CAC") at CHP, its

---

1       The factual background is derived from the undisputed evidence of record, and the disputed evidence is viewed in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

mission is "to protect children and promote healthy families through excellence in assessment of child maltreatment, medical and social care for vulnerable children, collaboration with child-protection agencies [and] education and research." (Docket No. 60-3 at 2). The purposes of the CAC are "(a) to ensure that injured, vulnerable patients receive competent assessment for concerns of maltreatment and (b) to ensure that there are ongoing medical and social services for children who have been abused or are at risk of abuse." (Id. at 3). To these ends, CAC physicians are responsible for medical service, teaching, research and administrative leadership. (Id.). The goals and objectives of the medical/clinical service include the following:

- To provide consultative services for children receiving care at Children's Hospital, including forensic medical and social evaluations of children who may be victims of child abuse or neglect. This service involves collaboration with other physicians on the medical staff, including specialists from trauma, neurosurgery, orthopaedics, radiology, ophthalmology, emergency medicine, behavioral health, and pediatrics.
- To work with professionals from community-based child-protection agencies and to support the judicial system in the protection of children. This includes providing **objective** medical information through consultative reports and legal testimony for (a) the judicial system, both in family court and criminal court settings; (b) professionals working in the Office of CYF; (c) law-enforcement agencies; and (d) the district attorney's offices.
- To provide pediatric medical care to vulnerable children in the child-protection system. . . .

(Id.) (emphasis added).

Dr. Eichman is listed in the CAC's Annual Statement as an Assistant Professor of Pediatrics, but she testified that she is not employed by the CAC. (Docket No. 60-3 at 3; Docket No. 60-6 at 57:16-17). Dr. Eichman is employed by University of Pittsburgh Physicians ("UPP"), which is a physician group affiliated with UPMC, and the University of Pittsburgh as a pediatrician and an assistant professor of pediatrics. (Docket No. 60-6 at 12:1-17, 57:16-17). Dr. Eichman is separately compensated by UPP and the University, and she does not receive any compensation from the CAC. (Id. at 17:11-13, 20:25-21:5).

As an educator, Dr. Eichman's responsibilities include teaching medical residents, as well as teaching and training for community physicians, caseworkers and judges. (Docket No. 60-6 at 21:6-17). Dr. Eichman does not receive any compensation when she teaches and trains caseworkers or judges, but sometimes a donation is made to the hospital. (Id. at 21:25-22:4).

As a clinician, Dr. Eichman's job responsibilities include working as an attending pediatrician with the CAC, which began on July 1, 2013. (Docket No. 60-6 at 11:1-2, 15:12-16, 16:18, 57:16-58:1). In that role, Dr. Eichman is a consultant who evaluates a child and offers recommendations to physicians on the various primary services at CHP, such as general pediatrics, neurology or trauma. (Id. at 44:5-10). As a medical consultant, Dr. Eichman evaluates whether or not a child has been abused or neglected, which includes performing a comprehensive physical examination of the child. (Id. at 79:9-80:8). Dr. Eichman testified that she does not investigate child abuse, as would a caseworker or a police officer. (Id. at 78:14-16). Nonetheless, as a pediatrician, Dr. Eichman is a mandated reporter,[2] meaning that she is mandated to make a report to Child Protective Services ("CPS") if she has a reasonable suspicion of abuse or neglect. (Id. at 59:16-20).

Plaintiffs are the parents of two children, S.L.W. and D.W. (Docket No. 1 at ¶¶ 4-5). During S.L.W.'s one-month well child visit on July 14, 2015, the nurse practitioner at his pediatrician's office noticed four bruises on S.L.W., one each on his forehead, left inner elbow,

---

2 Under Pennsylvania law, "[t]he following adults shall make a report of suspected child abuse . . . if the person has reasonable cause to suspect that a child is a victim of child abuse:" a person licensed to practice in any health-related field under the jurisdiction of the Department of State; a medical examiner, coroner or funeral director; an employee of a health care facility licensed by the Department of Health; a school employee; an employee of a child-care service; a clergyman, priest, rabbi or minister; an individual who is responsible for the child's welfare or has direct contact with children; an employee of a social services agency; a law enforcement official; an emergency medical services provider; an employee of a public library who has direct contact with children in the course of employment; an attorney affiliated with an agency or organization that is responsible for the care, supervision or guidance of children; a foster parent; and an adult family member who is responsible for the child's welfare and provides services to a child in a family living home. 23 PA. CONS. STAT. ANN. § 6311(a).

right lower leg and back/waist area. (Docket No. 64-1 at 3). According to the pediatrician office notes, S.L.W.'s mother, Plaintiff A.L., stated that she may have remembered accidentally hitting his head when she placed him into his swing, but she did not see the other bruises until they were pointed out that day. (Id.). The office notes state, "d/w mother concern for possible medical condition as well as concern for someone inflicting intentional injury to nonmobile infant." (Id.). A.L. indicated that she understood and agreed to take S.L.W. to the emergency room at CHP for evaluation. (Id.). The office notes state that A.L. was aware that S.L.W. would have lab work and a skeletal survey as part of the evaluation. (Id.).

CHP Emergency Department records indicate that S.L.W. presented for evaluation because his primary pediatrician's office was concerned about the unexplained bruises. (Docket No. 76-1 at 21). Based on the history provided by S.L.W's mother, there was concern for non-accidental trauma perpetrated by his father, Plaintiff S.W. (Id.). The Emergency Department notes document that S.W. had been on feeding duty with S.L.W. on Saturday night (three days prior to presenting to CHP), and A.L. first noticed a bruise on S.L.W.'s back and leg on Sunday morning. (Id. at 24). A.L. asked S.W. about the bruises, and he responded that he "may have been frustrated" and "perhaps he had been a little rough with the baby." (Id.). The Emergency Department notes further indicate that there was no family history of bleeding disorders, but A.L. bruises easily, and it was noted that S.L.W.'s leg was bruised after his blood pressure was taken. (Id. at 25).

The Emergency Department consulted with a doctor on the trauma service, as well as Dr. Eichman to perform an evaluation of S.L.W. because of concerns for abuse. (Docket Nos. 60-6 at 175:17-25; 76-1 at 23). Dr. Eichman performed a physical examination of S.L.W. and obtained history from A.L, who told Dr. Eichman that S.W. had night duty on Saturday night, and she noticed a bruise on S.L.W.'s forehead and back on Sunday morning. (Docket No. 64-3 at 2, 3, 6).

S.W. did not have an explanation for the forehead bruise, other than he "was probably too rough with the baby." (<u>Id.</u> at 3). As to the back bruise, S.W. said that was probably due to him "massaging S.L.W.'s belly due to gas." (<u>Id.</u>). A.L. also noted that she bumped S.L.W.'s head while putting him into his swing a few days earlier, but the impact seemed insignificant. (<u>Id.</u>). Dr. Eichman's notes indicate that A.L. said she bruises easily and has heavy periods, but she has not had a formal work-up. (<u>Id.</u> at 4).

Dr. Eichman reported that S.L.W.'s CT scan and skeletal survey were preliminarily normal, but his bloodwork was pending. (Docket No. 64-3 at 8). The report stated that "[b]ruising in a non-mobile infant is HIGHLY CONCERNING for physical child abuse," thus more medical information, including a dilated eye exam and further bloodwork, will be forthcoming. (<u>Id.</u>). Dr. Eichman noted, "will file a ChildLine with ACCYF and await a safety plan," S.L.W.'s sister, D.W., must also be seen for a physical exam, and S.L.W. must have a follow-up skeletal survey in 10-14 days. (<u>Id.</u>). Dr. Eichman suspected S.L.W. may have been abused based on the concerning objective factor of bruising on a non-mobile infant, along with the history provided by A.L. indicating that S.W. might have been a little rough with him. (Docket No. 60-6 at 176:14-25).

The ChildLine Report of Suspected Child Abuse was filed on July 14, 2015, at 3:33 p.m. (Docket No. 66-6). Dr. Eichman explained that the ChildLine report is electronically filed and sent to the state in Harrisburg, and then the state contacts the county where the potential abuse occurred. (Docket No. 60-6 at 177:18-178:1). In this case, the state contacted Allegheny County CYF, which then began an investigation. (<u>Id.</u> at 178:6-10).

A report dated July 14, 2015, by CYF caseworker Andrew Fleming indicates that the ChildLine was filed for Dr. Eichman with an eSignature by Jamie Zaremski. (Docket No. 60-7 at 2). Mr. Fleming's report notes that Dr. Eichman called at 5:30 p.m. to confirm whether CYF

received the ChildLine report.  (Id.).  Mr. Fleming's report recounts that S.L.W. was seen at his pediatrician's office earlier that day and he was referred to CHP because of bruising for which the only explanation was that S.W. may have been too rough with him.  (Id. at 1, 2).  Mr. Fleming's report further states that sibling D.W. was examined at the CHP Emergency Department and there were no medical concerns with her.  (Id. at 2).  D.W. was ready for discharge, but Dr. Eichman was concerned about her leaving with S.W. until CYF implemented a safety plan.  (Id.).

On the evening of July 14, 2015, CYF caseworker Angelica Salih met with and interviewed Plaintiffs at CHP.  (Docket No. 66-7).  Dr. Eichman was not present when Ms. Salih interviewed Plaintiffs, nor when any investigation occurred.  (Docket No. 60-6 at 178:8-14).  A.L. told Ms. Salih that she noticed the bruise on S.L.W.'s forehead on Sunday morning and that she noticed a bruise on his left arm, lower back and leg throughout the day on Sunday.  (Docket No. 66-7 at 2).  A.L. asked S.W. about the bruising, as he had the previous night duty with S.L.W., and S.W. stated that he gave S.L.W. a belly massage to alleviate gas, which he thought might have caused the bruise on S.L.W.'s back.  (Id.).  S.W. admitted that he may have been "a little too rough" with S.L.W., but he denied intentionally harming the baby.  (Id.).  S.W. also told Ms. Salih that the belly massage might have caused S.L.W.'s back bruise, but he denied intending to harm the child.  (Id. at 3).

The report of Ms. Salih's July 14, 2015, meeting and interview of Plaintiffs notes that they expressed great frustration with "being treated guilty until proven innocent."  (Docket No. 66-7 at 3).  Despite their frustration, Plaintiffs agreed to a safety plan, which provided that S.W. would have no unsupervised contact with S.L.W. and D.W. during the investigation period.  (Id.).  A.L. and S.W. indicated that they understood the plan and they signed it.  (Id.).  Dr. Eichman testified that she was not involved in formulating the safety plan, as that is not her purview.  (Docket No.

60-6 at 178:20-25).

The report of Ms. Salih's interviews with Plaintiffs also indicates that they agreed to leave S.L.W. at CHP overnight and return home with D.W.  (Docket No. 66-7 at 3).  That evening, Ms. Salih conducted an inspection of Plaintiffs' home, and no concerns were noted.  (Id.).

Dr. Eichman again met with S.L.W.'s parents on July 15, 2015.  (Docket No. 76-1 at 48). A.L. told Dr. Eichman that they had met with a CYF caseworker and signed a safety plan pursuant to which she would supervise S.W.'s contact with the children.  (Id.).  A.L. asked why CYF was involved when there were still medical tests pending which could "exonerate" them.  (Id.).  Dr. Eichman explained that the threshold to file a report is "a reasonable concern for abuse, not a definite diagnosis of abuse" and the priority is to ensure the child's immediate safety because some medical tests can take weeks to return.  (Id. at 48-49).  Dr. Eichman reviewed with Plaintiffs that there was a concern for physical abuse because S.L.W. was only four weeks old, he was "not yet cruising or even moving" and routine infant care does not cause bruising, thus it was abnormal for him to have any bruises.  (Id. at 49).  Dr. Eichman explained that it was important to recognize that S.L.W. was most likely hurt by an adult caretaker, which she observed Plaintiffs were having difficulty accepting.  (Id.).  S.L.W. was discharged from the hospital later that day and a follow-up examination was scheduled at the CAC on July 28, 2015.  (Id. at 36).

On July 17, 2015, Dr. Eichman received the preliminary results of S.L.W's bloodwork, which were all within a normal range.  (Docket No. 76-1 at 48).  Dr. Eichman's treatment notes document her conversation with A.L. concerning the results:

> I gave [S.L.W.'s] mother the preliminary results of his von Willebrand screen.  I explained that these results will be verified by the hematologist and that I will call if there are any changes in the results, I will call his family.  His mother asked whether there was any significance to his Factor IX level being in the lower end of normal range.  I explained that I spoke with the attending hematologist, and that normal is normal. If [S.L.W.] had a clinically significant bleeding disorder, the

screens sent (Factor VII and Factor IX and von Willebrand screen) would have showed an abnormality.

(Id.). Dr. Eichman testified that the referenced conversation with the attending hematologist was a "curbside consult," which meant that she asked for the hematologist's help in interpreting lab work based on the clinical scenario she described. (Docket No. 60-6 at 135:8-17). In view of S.L.W.'s normal bloodwork test results, Dr. Eichman did not refer him to a hematologist. (Id. at 148:4-25).

According to Mr. Fleming's notes on July 21, 2015, Detective Honan of the Pittsburgh Police had explained to A.L. that he was waiting for results from the scheduled follow-up at the CAC on July 28, 2015, and then he would interview S.W. (Docket No. 60-9 at 1). Detective Honan said that his course of action "would largely depend upon whether or not Dr. Eichman's medical opinion found [S.W.'s] explanation of [S.L.W.'s] injuries to be plausible and/or consistent." (Id.). If Dr. Eichman's medical opinion was that S.L.W.'s injuries were "diagnostic of child abuse, Detective Honan said he would approach the DA, and if the DA told him to charge [S.W.], then he would press charges." (Id. at 1-2). Mr. Fleming's notes also document that he provided Detective Honan with information concerning his interviews with Plaintiffs and the safety plan which CYF put in place to assure the children's safety during the investigation. (Id. at 2).

Dr. Eichman's July 28, 2015, report of S.L.W.'s follow-up examination recounts the history of his case and notes that his medical tests and bloodwork, including tests to screen for a bleeding disorder, were normal. (Docket No. 60-1 at 1). Dr. Eichman spoke with Plaintiffs, who said that S.L.W. was doing well and they had not noticed any new bruises or injuries. (Id.). Dr. Eichman examined S.L.W. and noted normal findings. (Id. at 3). Dr. Eichman concluded that "[t]he bruises found on [S.L.W.] were the result of physical child abuse. [S.L.W.] could not have

caused the bruises himself.  Routine care of an infant does not cause bruising.  [S.L.W.] does not have an underlying medical condition that would make him prone to bruising."  (Id. at 4).

A CYF Investigation Summary of S.L.W.'s case states, "[a]lthough the children's needs continue to be met and home visits revealed no immediate safety concerns, collateral contacts revealed concerns for physical abuse."  (Docket No. 70-2 at 3).  The Summary's Recommendation section stated:

> CPS saw injury.  Photographs of the injury were taken.  Dr. Eichman stated the injuries caused substantial pain.  CPS investigation determined that there is substantial evidence of causing bodily harm through [ ] recent act and/or failure to act.  This family has been accepted for services. . . . A Dependency Hearing is scheduled for 8/26/15.

(Id. at 5).

Based on an affidavit of probable cause by a Detective Honan, a criminal complaint charging one count of aggravated assault and one count of endangering the welfare of a child was filed against S.W. on August 18, 2015.  (Docket No. 60-10).  The criminal complaint summarizes Dr. Eichman's medical reports, including that S.L.W.'s medical tests and blood work were normal, and Dr. Eichman's opinion that "[t]he bruises found on [S.L.W.] were the result of physical child abuse."  (Id. at 3).  S.W. voluntarily turned himself in on August 20, 2015 and spent one night in jail before being released on bond, with the condition that he have no contact with any children, including his own.  (Docket No. 1, ¶¶ 98-99).  Dr. Eichman was not aware of S.W.'s arrest until November 2015.  (Docket No. 60-6 at 173:18-19).

In November 2015, S.L.W. was seen at the Hemophilia Center of Western Pennsylvania, and diagnosed with a platelet function disorder.  (Docket No. 1, ¶ 114).  On November 18, 2015, Dr. Eichman made an addendum to her report of July 28, 2015, indicating that she received a call from S.L.W.'s hematologist, who stated that he had further blood tests and was diagnosed with a

platelet function disorder. (Docket No. 60-1 at 4). Dr. Eichman wrote:

> Such an underlying bleeding disorder would make it easier for S.L.W. to bruise. It is important to note, however, that S.L.W. has not had any further bruising since 4 weeks of age. I continue to be concerned that S.L.W. was bruised due to a caretaker being too rough with him when he was 4 weeks of age.

(Id.). Dr. Eichman testified that when she ordered blood testing on S.L.W. in July 2015, she was not aware that the results of those tests could come back normal and he still could have a bleeding disorder. (Docket No. 60-6 at 128:20-24). Dr. Eichman thought that running the testing recommended by the American Academy of Pediatrics would catch any clinically significant bleeding disorder. (Id. at 129:4-11). She did not learn until November 2015 that the blood tests which were done on S.L.W. in July 2015 would not have picked up on every bleeding disorder. (Id. at 172:21-24).

On November 25, 2015, the criminal charges against S.W. were withdrawn, and home visits by CYF ceased in December 2015. (Docket No. 1, ¶¶ 117-119). On May 4, 2016, the ChildLine report against Plaintiffs was changed to "unfounded." (Id., ¶ 120).

Although Dr. Eichman now knows that S.L.W. was diagnosed with a platelet function disorder, she stands by her statement that "[t]he bruises found on S.L.W. were the result of physical child abuse." (Docket No. 60-6 at 143:17-25). As Dr. Eichman testified, when she saw S.L.W. for a follow-up exam after his home environment had been changed, he did not have any new bruises. (Id. at 144:19-25). Dr. Eichman observed that if the bruising on S.L.W. was caused by a bleeding disorder, it did not make sense that he did not subsequently bruise. (Id. at 132:5-10). The absence of additional bruising, in conjunction with his normal test results, led her to diagnose abuse. (Id. at 144:21-25, 145:20-23).

### IV.    **Standard of Review**

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of litigation.  Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015) (citing Anderson, 477 U.S. at 248).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "When confronted with cross-motions for summary judgment, the 'court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'"  Anderson v. Franklin Inst., 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 615 n. 1 (E.D. Pa. 2003); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (citing Matsushita, 475 U.S. at 587).  When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party.  Id. (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  The benefit of the doubt will be given to allegations of the non-moving party when

in conflict with the moving party's claims.  <u>Bialko v. Quaker Oats Co.</u>, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing <u>Valhal Corp. v. Sullivan Assocs.</u>, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings.  <u>Betts v. New Castle Youth Dev. Ctr.</u>, 621 F.3d 249, 252 (3d Cir. 2010) (citing <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989)).  The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine issue.  <u>Guidotti v. Legal Helpers Debt Resolution, L.L.C.</u>, 716 F.3d 764, 773 (3d Cir. 2013) (citing <u>Celotex Corp.</u>, 477 U.S. at 324).

Consistent with these standards, and for reasons explained herein, there is no genuine issue of material fact concerning Dr. Eichman's status for purposes of 42 U.S.C. § 1983 – she is not a state actor.

## V.    <u>Analysis</u>

Plaintiffs' federal constitutional claims are brought pursuant to 42 U.S.C. § 1983, which provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.  In order to establish a claim under the statute, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."  <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995) (citation omitted).

In Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001), the Supreme Court held that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." To conduct this analysis, the Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists," which are as follows:

> (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009) (quoting Mark, 51 F.3d at 1142). In deciding whether state action has occurred, the central purpose of the inquiry is to "assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which plaintiff complains." Brentwood, 531 U.S. at 295 (citation omitted) (emphasis in original).

The thrust of Plaintiffs' claims in this lawsuit is that CYF and the Pittsburgh Police and/or District Attorney's Office adopted Dr. Eichman's opinion that S.L.W.'s bruising was caused by physical child abuse and that led to the actions which deprived Plaintiffs of their constitutional rights; that is, the implementation of a safety plan and the filing of charges against S.W. As stated, Dr. Eichman must be deemed to have been acting under color of state law in order for her to be liable to Plaintiffs under § 1983.

Plaintiffs contend that Dr. Eichman qualifies as a state actor "on the basis of at least two, if not all three of Kach's tests." (Docket No. 61 at 4). Despite this contention, Plaintiffs have not cited any case in which a court has found at the summary judgment state of the proceedings that a physician who examined a child for suspected child abuse and rendered an opinion concerning

same was deemed to be a state actor under any of the three <u>Kach</u> tests.[3] Plaintiffs have also failed to demonstrate that the evidence of record in this case establishes that Dr. Eichman is a state actor under any of the operative tests.

### A. **Dr. Eichman Did Not Exercise Powers That Are Traditionally the Exclusive Prerogative of the State**

"The Supreme Court has made clear that the scope of exclusive government functions is limited, reaching only those activities that have been 'traditionally the exclusive prerogative of the State.'" <u>Groman v. Twp. of Manalapan</u>, 47 F.3d 628, 640 (3d Cir. 1995) (quoting <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 842 (1982)). "[T]his test imposes a 'rigorous standard' that is 'rarely ... satisfied,' ... for 'while many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" <u>Robert S. v. Stetson Sch., Inc.</u>, 256 F.3d 159,

---

3       Plaintiffs acknowledge that the Third Circuit Court of Appeals recently declined to address the state actor status of physicians involved in the evaluation of child abuse. <u>See</u> Docket No. 78 (citing <u>Billups v. Penn State Milton S. Hershey Med. Ctr.</u>, 750 F. App'x 97, 102 (3d Cir. 2018) (even if physicians qualified as state actors, their statement indicating that child's coagulation level was normal did not violate parents' substantive due process rights)). District courts within the Third Circuit addressing the status of such physicians at the motion to dismiss stage have reached differing results. Plaintiffs rely on several cases in which courts ruled that sufficient facts were alleged to plausibly state a claim that a physician who examined a child relative to suspected abuse was a state actor for purposes § 1983 under the third <u>Kach</u> test. <u>See</u> <u>Billups v. Penn State Milton S. Hershey Med. Ctr.</u>, 910 F. Supp. 2d 745, 757-58 (M.D. Pa. 2012) (finding that the plaintiffs had alleged sufficient facts to establish that the defendant doctors would qualify as state actors because they examined the child to determine whether her injuries were the result of criminal activity); <u>A.P. v. Medina</u>, No. 17-13794, 2018 WL 3546195, at *3 (D.N.J. July 24, 2018) (appeal pending) (citing <u>Billups</u> and concluding the plaintiffs sufficiently alleged that a physician who issued a report concerning suspected child abuse was a state actor under the third <u>Kach</u> test); <u>Seldomridge v. Penn State Hershey Med. Ctr.</u>, Civ. No. 13-CV-2897, 2014 WL 2619371, at *4 (M.D. Pa. June 12, 2014) (concluding that the defendants qualified as state actors because they "conducted testing, and rendered opinions for the primary purpose of investigating suspected child abuse—not providing medical treatment"). Other district courts within this Circuit have reached the opposite conclusion concerning the state actor status of physicians who examined a child for potential abuse and have determined that sufficient facts were not alleged to survive a motion to dismiss. <u>See</u> <u>Dennis v. DeJong</u>, 867 F. Supp. 2d 588, 648 (E.D. Pa. 2011) (plaintiffs failed to allege sufficient facts that physician was a state actor where there was no evidence that his professional opinion or professional conduct concerning cause of child's injuries were dictated or controlled by the state); <u>K.S. v. Bruno</u>, No. 1:17-cv-00036, 2018 WL 1583527, at *9 (M.D. Pa. Mar. 30, 2018) (finding that plaintiffs failed to allege facts supporting inference that physicians who diagnosed child as having been physically abused engaged in joint activity with police sufficient to support state action element in § 1983 claim based on alleged Fourth Amendment violation arising out of caretaker's arrest on simple assault charges).

    In denying Dr. Eichman's motion to dismiss, this Court cited both <u>Billups</u> and <u>Seldomridge</u>. (Docket No. 35 at 12-13). Although the Court previously found that Plaintiffs sufficiently alleged Dr. Eichman's status as a state actor to survive a motion to dismiss, the evidence of record before the Court at this stage of the proceedings does not establish that she is a state actor under any of the <u>Kach</u> tests for the reasons explained herein.

165-66 (3d Cir. 2001) (quoting <u>Mark</u>, 51 F.3d at 1142; <u>Flagg Bros., Inc. v. Lefkowitz</u>, 436 U.S. 149, 158 (1978)).  "In the course of enunciating the contours of what constitutes an exclusive government function, the Supreme Court has held that receipt of public funds and the performance of a function serving the public alone are not enough to make a private entity a state actor." <u>Groman</u>, 47 F.3d at 640.  The Supreme Court also has held that "[a]cts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." <u>Rendell-Baker</u>, 457 U.S. at 841.

In analyzing whether one qualifies as a state actor under the public function test, "the relevant question is not simply whether a private group is serving a 'public function.'" <u>Rendell–Baker</u>, 457 U.S. at 842.  Rather, "the question is whether the function performed has been traditionally the <u>exclusive</u> prerogative of the State." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis in original).  Thus, it is essential to identify the functions which Dr. Eichman performed in this case and determine whether those functions have been traditionally the exclusive prerogative of the state.

As a pediatrician with the CAC, Dr. Eichman is a consultant who evaluates children and offers recommendations to physicians on the various primary services at CHP, such as general pediatrics, neurology or trauma.  (Docket No. 60-6 at 44:5-10).  Dr. Eichman also evaluates whether or not a child has been abused or neglected, which includes doing a comprehensive physical examination of the child, but she does not investigate child abuse, as would a caseworker or a police officer.  (<u>Id.</u> at 78:14-16, 79:9-80:8).  In this case, the CHP Emergency Department consulted with Dr. Eichman to perform an evaluation of S.L.W. because of concerns for abuse. (<u>Id.</u> at 175:17-25).  The record evidence shows that Dr. Eichman conducted a physical examination of S.L.W., obtained history from A.L. and ordered certain testing and bloodwork.  (Docket No.

64-3 at 2, 3, 6, 8).  After the bloodwork results and a follow-up physical examination of S.L.W. were found to be normal, Dr. Eichman rendered an opinion that the bruises on him were the result of physical child abuse.  (Docket Nos. 60-1 at 3, 4).  Dr. Eichman's examination of S.L.W., ordering medical tests and rendering an opinion as to the cause of his bruises are not functions that are traditionally the exclusive prerogative of the state; thus, she is not a state actor under the first Kach test.  See Klavan v. Crozer-Chester Med. Ctr., 60 F. Supp. 2d 436, 441 n.5 (E.D. Pa. 1999) (provision of hospital services is not a traditional public function exclusively reserved to state); Roulhac v. Lawler, Civ. No. 1:12-CV-311, 2014 WL 940322, at *2 (M.D. Pa. Mar. 11, 2014) (providing medical care is not traditionally an exclusive state function); Clearly v. County of Macomb, No. 06-15505, 2007 WL 2669102, at *10 (E.D. Mich. Sept. 6, 2007) ("[P]roviding a medical opinion in an ongoing investigation of sexual abuse has not been a power traditionally reserved exclusively to the state or the County of Macomb.").

Indeed, Plaintiffs acknowledge that "providing medical care is not the exclusive prerogative of the state." (Docket No. 63 at 5).  However, Plaintiffs contend that Dr. Eichman did not provide medical care to S.L.W., but rather investigated suspected child abuse under the contract between Allegheny County and CHP, and child abuse investigation is the exclusive prerogative of the state which delegated the duty to investigate to Allegheny County CYF.  (Id. at 8).

Plaintiffs' argument ignores the record evidence showing that the **actual** functions performed by Dr. Eichman in this case were examining S.L.W., ordering tests and rendering an opinion based on her examination and the test results.  Other than referencing the contract between Allegheny County and CHP that broadly mentions CHP's participation in the investigation of child abuse, Plaintiffs have not shown by record evidence that child abuse investigation is a function that has been traditionally the exclusive prerogative of the state.  See Rendell–Baker, 457 U.S. at

842. In order to determine whether a function is the "exclusive" prerogative of the state, courts look to the "historical practice" of the particular state at issue. Leshko v. Servis, 423 F.3d 337, 343 n.4 (3d Cir. 2005) (citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 55–57 (1999)). Again, Plaintiffs have not provided any such historical evidence that would suggest that the investigation of child abuse has traditionally been the "exclusive" prerogative of Pennsylvania.

Furthermore, Plaintiffs have not cited any authority holding that the investigation of child abuse is traditionally the exclusive prerogative of the Commonwealth of Pennsylvania. Instead, Plaintiffs cite Croft v. Westmoreland County Children & Youth Servs., 103 F.3d 1123, 1125 (3d Cir. 1997) for the proposition that a parent's liberty interest in the care, custody and management of his child "does not include a right to remain free from child abuse investigations." (See Docket No. 61 at 5; 63 at 6). Although Croft recognizes that the government has a compelling interest in protecting children, see 103 F.3d at 1125, it does not hold that child abuse investigation has been traditionally the exclusive prerogative of the state.

Plaintiffs' reliance on certain Pennsylvania statutes and regulations likewise fails to establish that child abuse investigation traditionally has been the exclusive prerogative of the state. See e.g., 55 PA. CODE § 3490.53(a) ("[t]he county agency is the sole civil agency responsible for receiving and investigating reports of child abuse . . ."); 23 PA. CONS. STAT. ANN. § 6365(c) (providing that a multidisciplinary investigative team shall be used to coordinate child abuse investigations and the team shall include, at a minimum, a law enforcement official, a county caseworker and a health care provider). Statutory provisions which empower state agencies to perform some function do not, as a matter of law, establish that the function at issue is exclusively a state function. See Rendell–Baker, 457 U.S. at 842 ("Chapter 766 of the Massachusetts Acts of 1972 demonstrates that the State intends to provide services for [maladjusted high school] students

at public expense. That legislative policy choice in no way makes these services the exclusive province of the State."). Indeed, "the fact that the relevant function is a 'creature of statute' rather than a constitutional mandate weighs against a finding that the function is traditionally and exclusively reserved to the state." Schutt v. Melmark, Inc., Civ. No. 15-2731, 2017 WL 1477130, at *5 (E.D. Pa. Apr. 24, 2017) (citing Leshko, 423 F.3d at 344-47). For instance, in holding that foster parents in Pennsylvania are not state actors for purposes of § 1983, the Third Circuit Court of Appeals explained in Leshko that "[c]onstitutional obligations on a state obviously are powerful evidence that the required functions are traditionally governmental, but here there are no such obligations. Instead . . . state-supervised foster care in Pennsylvania is a creature of statute, begun in 1901 under Pennsylvania's Juvenile Act. Statutory duties of even such early vintage are not traditionally governmental." Leshko, 423 F.3d at 344-45 (citation omitted). Similarly, in this case, child protective services, which includes the investigation of child abuse, are not a constitutional mandate, but rather a "creature of statute." See 23 PA. CONS. STAT. ANN. § 6301, et seq. Consequently, Plaintiffs' citation to certain Pennsylvania statutes and regulations does not establish that child abuse investigation has been traditionally the exclusive prerogative of the state. For this additional reason, Dr. Eichman is not a state actor under the first Kach test.

**B. Dr. Eichman Did Not Act With the Help of or in Concert With Allegheny County CYF and/or the Pittsburgh Police**

The second Kach test asks "whether the private party has acted with the help of or in concert with state officials." Kach, 589 F.3d at 646. Plaintiffs argue that this test is satisfied because Dr. Eichman acted as the *de facto* medical evaluator/investigator on behalf of Allegheny County pursuant to its contract with CHP. (Docket No. 61 at 10-11, 13). According to Plaintiffs, the contractual relationship between CHP and Allegheny County shows that Dr. Eichman's evaluation was "in concert with the state." (Docket No. 63 at 9). Dr. Eichman did not contract

with Allegheny County herself,[4] but even assuming she fulfilled a role contemplated by the contract, Plaintiffs' repeated contract argument fails because, as already stated, "[a]cts of ... private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Rendell-Baker, 457 U.S. at 841; see also Evans v. Torres, No. 94 C 1078, 1996 WL 5319, at *7 (N.D. Ill. Jan. 4, 1996) (holding that a physician and a pediatric center were not state actors even though they contracted with the state and received compensation in return for reporting their findings to the state's Department of Children and Family Services and testifying at criminal proceedings).

Plaintiffs cite no record evidence showing that Dr. Eichman acted with the help of or in concert with Allegheny County when she initially evaluated S.L.W. and ordered testing, re-evaluated him, or when she issued her opinion that his bruises were the result of physical child abuse. Plaintiffs argue, however, that concerted action is shown because Dr. Eichman called Allegheny County CYF "requesting a safety plan that prohibited S.W. from leaving the hospital with D.W." and a safety plan was subsequently instituted which prohibited S.W. from having unsupervised contact with the children. (Docket No. 63 at 9). The evidence does not show that Dr. Eichman "requested" a safety plan, as Plaintiffs suggest, or otherwise demonstrate any concerted action. Rather, Mr. Fleming's report indicates, *inter alia*, that Dr. Eichman called to confirm whether CYF received the ChildLine report concerning S.L.W. and that sibling D.W. was examined and ready for discharge, but Dr. Eichman was concerned about her leaving with S.W.

4        To be clear, the contract Plaintiffs repeatedly reference was between Allegheny County CYF and CHP. (Docket No. 60-4 at 1, 49). Dr. Eichman explained that CHP is part of UPMC, and the CAC is affiliated with CHP, but she did not know the specifics of that relationship. (Docket No. 60-6 at 19:3-5, 19:21-22). Dr. Eichman is employed and compensated by UPP, a physician group affiliated with UPMC, and the University of Pittsburgh; however, she is not employed by the CAC. (Id. at 12:1-17, 17:11-13, 20:25-21:5, 57:16-17). "[B]ecause labels are not dispositive in state action cases, the technicalities of [Dr. Eichman's] employment status are immaterial for purposes of determining whether [she] acted under color of state law." Kach, 589 F.3d at 649 n.22 (citing Polk County v. Dodson, 454 U.S. 312 (1981) (rejecting formalisms in determining whether a public defender was a state actor and considering instead defender's actual function)).

until CYF implemented a safety plan. (Docket No. 60-7 at 2). Though Dr. Eichman expressed concern in that regard, there is **no** evidence that Dr. Eichman was consulted by CYF relative to creating and implementing a safety plan or that she played any role whatsoever in that matter. As Dr. Eichman unequivocally testified, she was not involved in formulating the safety plan, as that is not her purview. (Docket No. 60-6 at 178:20-25).

Plaintiffs' assertion that Dr. Eichman acted in concert with the Pittsburgh Police likewise is unsupported by the record evidence. According to Plaintiffs, in deciding to charge and arrest S.W., Detective Honan substituted Dr. Eichman's judgment for his own on the issue of whether S.L.W. was abused. (Docket No. 63 at 10). Plaintiffs insist that this is so because Mr. Fleming's notes state that Detective Honan's course of action "would largely depend upon whether or not Dr. Eichman's medical opinion found [S.W.'s] explanation of [S.L.W.'s] injuries to be plausible and/or consistent." (Docket No. 63 at 10 (quoting Docket No. 60-9 at 1)). Plaintiffs ignore that Mr. Fleming further noted that if Dr. Eichman's medical opinion was that S.L.W.'s injuries were "diagnostic of child abuse, Detective Honan said he would approach the DA, and if the DA told him to charge [S.W.], then he would press charges." (Docket No. 60-9 at 1-2). Mr. Fleming's notes show that Detective Honan was gathering information about S.L.W.'s case, including Dr. Eichman's medical opinion, but it was the District Attorney's decision whether to charge S.W. with a crime. It was entirely proper for Detective Honan to consider Dr. Eichman's medical report and opinion, and cite it in the affidavit of probable cause supporting the criminal complaint against S.W. (Docket No. 60-10 at 3). None of this shows that Dr. Eichman acted with the help of or in concert with the police. There is no evidence that the police or the District Attorney influenced Dr. Eichman's evaluation of S.L.W. or her opinion that his bruising was caused by physical child abuse, nor is there any evidence that Dr. Eichman opined on whether charges should be filed

against S.W.[5]  As Dr. Eichman testified, she was not aware that S.W. had been arrested until November 2015.  (Docket No. 60-6 at 173:18-19).

In sum, there is no evidence that Dr. Eichman acted with the help of or in concert with either Allegheny County CYF in its creation and implementation of a safety plan in S.L.W.'s case or with the Pittsburgh Police and/or the District Attorney in the decision to charge S.L.W.; thus, she does not qualify as a state actor under the second <u>Kach</u> test.

### C. Allegheny County CYF and/or the Pittsburgh Police Did Not Insinuate Itself Into a Position of Interdependence With Dr. Eichman

The third <u>Kach</u> test involves whether "[t]he State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." <u>Kach</u>, 589 F.3d at 646.  Under this test, "state action will be found if there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action may be fairly treated as that of the State itself."  <u>Kach</u>, 589 F.3d at 648 (citation omitted).  "Acts of private contractors do not become acts of the State simply because they are performing public contracts. The State will be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State."  <u>Id.</u> (citation omitted).  The focus of the inquiry "is not on whether the state exercises control over a putative state actor as a general matter, but whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation."  <u>Id.</u> at 649.

Plaintiffs contend that Dr. Eichman is a state actor under the third <u>Kach</u> test because

---

5       Prosecutors exercise independent judgment in deciding whether to file charges against an individual, and the "presumption that a prosecutor has legitimate grounds for the action he takes is one we do not lightly discard." <u>Hartman v. Moore</u>, 547 U.S. 250, 263 (2006).  There is no evidence in this case that Dr. Eichman interfered with the District Attorney's independent judgment in charging S.W. with aggravated assault and endangering the welfare of a child.

Allegheny County has so far insinuated itself into a position of interdependence with CHP's CAC and Dr. Eichman that her medical evaluation of whether S.L.W.'s bruises were abusively inflicted must be recognized as joint participation in the County's child abuse investigation and the District Attorney's decision to file charges against S.W. (Docket Nos. 61 at 13-18; 63 at 12-19; 71 at 4-5). Once again, the thrust of Plaintiffs' argument is that Dr. Eichman was performing contractual obligations concerning the investigation of child abuse pursuant to CHP's contract with Allegheny County, (Docket No. 61 at 14), which alone is not sufficient to establish that Dr. Eichman is a state actor under the third <u>Kach</u> test. See <u>Kach</u>, 589 F.3d at 648.

To repeat, the focus of the inquiry is "whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation." <u>Kach</u>, 589 F.3d at 649. According to Plaintiffs, Dr. Eichman's medical report indicating that S.L.W.'s bruises were the result of physical child abuse was the reason a safety plan was implemented which precluded S.W. from unsupervised contact with the children and the reason that he was charged and arrested. There is no evidence in the record, however, that Allegheny County CYF, the Pittsburgh Police or the District Attorney's Office exercised coercive power or provided significant encouragement which dictated or controlled Dr. Eichman's medical examination of S.L.W. or her opinion that his bruises were caused by abuse. See <u>Groman</u>, 47 F.3d at 642 (finding no state action with respect to private actor for § 1983 purposes where "[t]here [was] no evidence that the Township controlled the first aid squad's professional conduct."). On the contrary, the gravamen of Plaintiffs' argument is that Dr. Eichman influenced CYF's decision to implement a safety plan and the police's decision to charge S.W., though the record evidence does not support

Plaintiffs' position in either regard. In sum, there is no evidence to support a finding that Dr. Eichman qualifies as a state actor under the third <u>Kach</u> test.[6]

**VI.      Conclusion**

The evidence of record fails to establish that Dr. Eichman was acting under color of state law for purposes of 42 U.S.C. § 1983; thus, Plaintiffs' constitutional claims fail as a matter of law. Accordingly, Defendant's motion for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

March 26, 2019

cc/ecf: All counsel of record

---

[6]      Plaintiffs also contend that state action is shown because Dr. Eichman's "actions were completely useless from a medical treatment perspective because she failed to identify S.L.W.'s inherited platelet function disorder and failed to refer S.L.W. to a physician with qualifications to do so." (Docket No. 61 at 16). Plaintiffs have not cited any authority for the proposition that a doctor's alleged missed diagnosis in a situation such as this establishes that the doctor was a state actor. The Court notes, however, that Dr. Eichman candidly explained she was not aware in July 2015 that the results of the blood tests she ordered on S.L.W. at that time could come back normal and he still could have a bleeding disorder. (Docket No. 60-6 at 128:20-24). Dr. Eichman thought that running the testing recommended by the American Academy of Pediatrics would catch any clinically significant bleeding disorder. (<u>Id.</u> at 129:4-11). She did not learn until November 2015 that the blood tests which were done on S.L.W. in July 2015 would not have picked up on every bleeding disorder. (<u>Id.</u> at 172:21-24).